THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>   vs.<br><br>ANDY NAHKAI,<br><br>   Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS**<br><br>Case No. 4:22-cr-00030 DN<br><br>District Judge David Nuffer |

The government indicted Andy Nahkai ("Nahkai") with three counts of Abusive Sexual Contact with a Child.[1] On December 14, 2023, Nahkai filed a Motion to Suppress[2] arguing his statements to law enforcement must be suppressed because these statements were obtained in violation of his *Miranda* rights.[3]  On January 18, 2024, an evidentiary hearing s was held.[4] As instructed, the government filed a Proposed Order for the Motion on February 12, 2024, and Defendant filed a Proposed Order on February 27, 2024.[5] A Draft Order was provided to counsel on March 18, 2024.[6] The case was argued on March 21, 2024, and March 29, 2024.[7]

---

[1] Indictment, docket no. 1, filed March 23, 2022.

[2] Motion to Suppress, docket no. 54, filed December 14, 2023.

[3] Nahkai's Motion to Suppress also argues the government violated his Fifth Amendment right to due process. However, at oral argument, Nahkai withdrew his Fifth Amendment claim.

[4] Minute Entry for Hearing, docket no. 62, filed January 18, 2024.

[5] Government's Proposed Order, docket no. 69, filed February 12, 2024; Defendant's Proposed Order, docket no. 72, filed February 27, 2024.

[6] Draft Order, docket no. 77, filed March 18, 2024.

[7] Transcript of Second Hearing, docket no. 81, filed March 25, 2024 ("Tr. of Second Hearing"); Transcript of Third Hearing ("Tr. of Third Hearing"), docket no. 86, filed April 24, 2024; Minute Entry, docket no. 78, filed March 21, 2024; Minute Entry, docket no. 84, filed March 28, 2024.

Nahkai's Motion to Suppress is GRANTED after consideration of the evidence and arguments. *Miranda* warnings were not given; Nahkai was interrogated; and Nahkai was in custody.

## TABLE OF CONTENTS

A.   FINDINGS OF FACT ............................................................................................................. 2
B.   DISCUSSION ..................................................................................................................... 13
     1.   The agents interrogated Nahkai ..................................................................... 13
     2.   Nahkai was in custody when interrogated by officers ......................................... 14
          i.    The agents' failure to notify Nahkai he was free to leave and to end the interview weighs in favor of finding Nahkai was in custody .................. 15
          ii.   The accusatory nature of the questioning weighs in favor of finding Nahkai was in custody ............................................................................ 23
          iii.  Police domination of the encounter weighs in favor of finding Nahkai was in custody ......................................................................................... 29
          iv.   The release of Nahkai after the interview weighs in favor of finding Nahkai was not in custody ...................................................................... 35
          v.    Under the totality of circumstances, Nahkai was in custody during the interrogation ........................................................................................... 36
          vi.   This Order does not consider the fact the interview was conducted in English or that Nahkai is a member of the Navajo Nation ...................... 37
C. ORDER ................................................................................................................................ 39

## A.    FINDINGS OF FACT

1.      On February 10, 2022, FBI Special Agent Jarrod Girod ("Agent Girod") and Navajo Criminal Investigator Reeder Nez ("Investigator Nez") traveled to Nahkai's home to speak with him about sexual abuse allegations his wife's niece made against him.[8]

2.      At some point before meeting with Nahkai, Agent Girod had reviewed the minor's forensic interview.[9] He was also aware that because of her allegations, the minor had been removed from the Nahkai home and was in DCFS custody.[10]

---

[8] Official Transcript of Motion to Suppress Hearing ("Tr. of Evidentiary Hearing") at 13:25–14:2; *United States v. Nahkai*, 4:22-cr-00030-DN-PK (D. Utah Jan. 31, 2024), docket no. 64, filed January 31, 2024.

[9] Tr. of Evidentiary Hearing, 13:9–16.

[10] Tr. of Evidentiary Hearing, 13:9–11; 30:8–18.

3.      Nahkai is a member of the Navajo nation.[11]  At the time of the interview, he was almost 73 years old.[12] Navajo is his first language.[13]

4.      Agent Girod invited Investigator Nez to accompany him for the interview.[14] Agent Girod testified that the FBI and Navajo Criminal Investigations work together because the agencies have concurrent jurisdiction, and because Navajo Criminal Investigators have expertise on Navajo culture and language.[15] Agent Girod is not Navajo but has worked in the Monticello area for seven years.[16]

5.      Agent Girod traveled to the Nahkai residence in a Ford F-150 truck.[17] The truck was unmarked, with no government plates, insignia, or visible lights.[18] The truck was equipped with covert lights and sirens, but Agent Girod did not activate them.[19] Investigator Nez traveled to the Nahkai residence in an SUV, which was also unmarked and without visible law enforcement insignia or equipment.[20]

---

[11] Tr. of Evidentiary Hearing, 31:21-22.

[12] Tr. of Evidentiary Hearing, 38:21-24.

[13] The court makes the finding that Navajo is Nahkai's first language based on: (1) Nahkai being a Navajo native; (2) a Navajo criminal investigator was brought for the discussion and initially conversed with Nahkai in Navajo; and (3) in the court's judgment, the audio recording reveals English is not Nahkai's first language. The government objected to the finding on the grounds that it was not specifically made at the evidentiary hearing. Tr. of Second Hearing, at 23:8-24:12. The government's objection overlooks "the district court's ability to make reasonable inferences from the evidence." *United States v. Zar*, 790 F.3d 1036, 1047 (10th Cir. 2015) (citing *United States v. Mabry*, 728 F.3d 1163, 1166 (10th Cir.2013)). Additionally, at the third hearing, United States Federal Public Defender Emily Stirba specifically stated that Nahkai's first language is Navajo. Tr. of Third Hearing, at 35:8-9. For these reasons, the government's objection is overruled.

[14] Tr. of Evidentiary Hearing, 13:17–19.

[15] Tr. of Evidentiary Hearing, 13:20–24.

[16] Tr. of Evidentiary Hearing, 11:22-25.

[17] Tr. of Evidentiary Hearing, 14:2-4.

[18] Tr. of Evidentiary Hearing, 14:5–14.

[19] Tr. of Evidentiary Hearing, 14:15–18.

[20] Tr. of Evidentiary Hearing, 47:20–25.

6.    The Nahkai residence was fairly visible from the dirt road.[21] There was also one other home located on that same road which was visible from the Nahkai residence.[22] Other than those two residences, nothing else was visible in close proximity.



7.    The Nahkai residence is accessible from the dirt road that runs by the property.[23]



8.    The officers arrived at the Nahkai home and pulled up one after the other to a closed gate in front of the property.[24] Martha Nahkai ("Martha"), who is Nahkai's wife, was standing alone at the gate when the officers arrived.[25]

---

[21] Tr. of Evidentiary Hearing, 18:6–10.

[22] Tr. of Evidentiary Hearing, 18:1-5.

[23] Witness and Exhibit List, Photograph of House, docket no. 63, at 1-3, filed January 18, 2024. Nahkai's Ex. 1; Video of Property, Nahkai's Ex. 4.

[24] Tr. of Evidentiary Hearing, 36:2-7.

[25] Tr. of Evidentiary Hearing, 36:8-17.

9.     The officers showed up to the Nahkai residence without notifying the residents that were coming beforehand.

10.     Investigator Nez spoke with Martha in Navajo at the gate to confirm that the investigators were at the right residence.

11.     Investigator Nez was wearing a dark shirt that had a law enforcement star on it, and a visible weapon was holstered on his right side.[26] Agent Girod was in plain clothes with hiking pants and a button-up shirt.[27] Agent Girod carried a firearm that was concealed throughout the visit.[28]

12.     Investigator Nez explained in Navajo to Martha that he was "with the investigator," i.e. Agent Girod.[29]  Martha queried, "What?" and Investigator Nez elaborated, explaining he referred to "the white person" who "drove from Monticello."[30]

13.     After Investigator Nez identified Agent Girod, Agent Girod asked Martha in English if she had a few minutes to talk.[31]

14.     Martha agreed to talk and offered to open the gate for the officers.[32]

15.     After Martha opened the gate, and the officers drove onto the Nahkai property. Agent Girod parked his truck facing the front of the residence, approximately 30 to 40 feet from the door.[33]

---

[26] Tr. of Evidentiary Hearing, 50:7-51:2.

[27] Tr. of Evidentiary Hearing, 21:8–16.

[28] Tr. of Evidentiary Hearing, 21:17–20.

[29] Witness and Exhibit List, English Translation of Navajo Conversation, Def. Ex. 5, docket no. 63, at 1.

[30] Id.

[31] Id.

[32] Id.

[33] Tr. of Evidentiary Hearing, 20:9–19.

16.     Investigator Nez parked his SUV between the end of the Nahkai house (as identified by a metal pole) and the front door of the house.[34]

17.     Martha and Nahkai came out of the residence. Nahkai came out of the house on his own accord. The officers did not enter the Nahkai residence.[35]

18.     Investigator Nez spoke to Martha in both Navajo and English and said "can we talk with you in a while?" Martha responded in English by asking, "Just him?" Investigator Nez replied in English that they were going to talk to "him," meaning Nahkai, and told Martha "we will get back with you."[36]

19.     Approximately, four seconds elapsed from when Martha Nahkai stated "Just him?" and Andy Nahkai informed officers that he was Andy Nahkai.[37]

20.     After Nahkai identified himself to the officers, Investigator Nez gave some explanations, partly in English and partly in Navajo.[38]

21.     Investigator Nez, a Navajo himself, introduced himself in Navajo by saying, "I work with them in Kayenta," and in English introduced Agent Girod as a "friend from Monticello."[39] Investigator Nez also showed his credentials—a criminal investigation badge and card.[40]

---

[34] Tr. of Evidentiary Hearing, 49:11–50:2.

[35] Tr. of Evidentiary Hearing, 51:8–10. The parties provided the facts that are articulated in this paragraph, and the parties stipulated to the facts in this paragraph.

[36] Tr. of Evidentiary Hearing, 68:17-69:9.

[37] Witness and Exhibit List, Navajo Translation, Ex. 5, docket no. 63, at 2; Gov. Ex. 1, at 3:22-3:26.

[38] Witness and Exhibit List, Navajo Translation, Def. Ex. 5, docket no. 63, at 2.

[39] Witness and Exhibit List, Navajo Translation, Def. Ex. 5, docket no. 63, at 2.

[40] Tr. of Evidentiary Hearing, 55:23–56:1.

22.     Investigator Nez then told Nahkai in Navajo, "We were to ask about some things and that is why I came with him."[41]

23.     From there, Agent Girod said in English "Why don't we, why don't we jump in the ride? Why don't you sit – do you want to sit in my passenger seat?" to which Investigator Nez replied, "Okay."[42] There was no audible response from Nahkai.

24.     Nahkai entered Agent Girod's Ford F-150 and sat on the front passenger seat. Agent Girod sat in the driver's seat.  Investigator Nez sat in the backseat directly behind Agent Girod.[43] Martha Nahkai went back inside the residence during the interview.[44]

25.     Prior to entering the vehicle, neither officer asked Nahkai if he had a weapon, handcuffed him, or touched him.[45] And while both officers had weapons, neither weapon was ever unholstered.[46]

26.     Neither officer told Nahkai that he was under arrest or that he was not under arrest.[47]

27.     The interior of Agent Girod's Ford F-150 contained two indicia of law enforcement: a radio control with a microphone in the center console and a rifle rack in the back.[48] Agent Girod testified to turning down the radio, so it was not broadcasting during their

---

[41] Witness and Exhibit List, Navajo Translation, Def. Ex. 5, docket no. 63, at 2.

[42] Witness and Exhibit List, Navajo Translation, Def. Ex. 5, docket no. 63, at 2.

[43] Tr. of Evidentiary Hearing, 22:4–8; 52:15–25.

[44] Tr. of Evidentiary Hearing, 75:13-17.

[45] Tr. of Evidentiary Hearing, 22:11–20.

[46] Tr. of Evidentiary Hearing, 21:19–20.

[47] Tr. of Evidentiary Hearing, 25:7–9.

[48] Tr. of Evidentiary Hearing, 22:21–23:1.

conversation.[49] There was no cage barrier separating the front and back of the truck.[50] There were no restraints in the vehicle other than seat belts, and the seat belts were not used.

28.     The doors to the truck were unlocked.[51] At the hearing, Agent Girod testified "[y]ou could look down and see that [the doors] were unlocked."[52] Neither officer directed Nahkai's attention to this fact.[53]

29.     Neither Agent Girod nor Investigator Nez gave Nahkai a *Miranda* warning.[54]

30.     Nahkai was never told he could leave or not answer the agents' questions.[55] Nahkai was never expressly told he had to stay and answer questions.

31.     Once inside the vehicle, Agent Girod identified himself as an FBI agent, and he then began questioning Nahkai in English.[56]

32.     The questioning lasted approximately 41 minutes.[57]

33.     Agent Girod did at least 80% of the questioning of Nahkai, and all of the questioning was in English. [58] There was no simultaneous questioning by the agents. Agent Girod testified that he never got the impression Nahkai had difficulty communicating in English, couldn't understand the questions, or was confused.[59] Investigator Nez also indicated Nahkai

---

[49] Tr. of Evidentiary Hearing, 72:24–73:1.

[50] Tr. of Evidentiary Hearing, 23:2-3.

[51] Tr. of Evidentiary Hearing, 27:8–10.

[52] Tr. of Evidentiary Hearing, 27:11–12.

[53] *See generally*, Gov. Exh. 1.

[54] Tr. of Evidentiary Hearing, 39:24-40:1.

[55] Tr. of Evidentiary Hearing, 24:22–25:3; 74:6–9; 74:17–20.

[56] Audio Recording of Interrogation, Gov. Ex. 1 at 4:33–38.

[57] *Id.* at 4:30-45:10.

[58] Tr. of Evidentiary Hearing, 24:1–15.

[59] Tr. of Evidentiary Hearing, 24:16–21.

ably conversed in English, providing responsive answers to the questions posed.[60] Indeed, "Mr. Nahkai never asked for Navajo translation during Agent Girod's questioning and discussion."[61]

34.     During parts of the interview, the audio recording of Nahkai's speech was difficult to understand.[62] It appeared Nahkai used a few words of Navajo during the questioning.[63]

35.     The initial tone of the discussion was "conversational."[64] However, Agent Girod then asked Nahkai about why his wife's minor niece no longer lived with Nahkai and his wife.[65]

36.     The remainder of the conversation centered on the child's accusations against Nahkai.  Agent Girod testified the conversation was conversational and confrontational.

> Q. What was the tone of the conversation?
> A. Um, it was conversational. It was conversational, and then eventually it became confrontational, but in no way were we like raising our voices or anything like that."[66]

Agent Girod repeatedly told Nahkai that he was not telling the truth and confronted him with the minor's accusations.

37.     The questioning of Nahkai included the following exchanges:[67]

---

[60] Tr. of Evidentiary Hearing,53:24–54:6.

[61] Tr. of Evidentiary Hearing, 73:13–15.

[62] Gov. Ex. 1, at 14:30-15:25, 24:48-25:05; 26:33-27:17; 29:00-30:45. Although the officers testified that Nahkai had no difficult communicating in English, the court relies on the audio recording of the conversation to make this finding.

[63] The court makes this finding based on its listening of the audio recording. Additionally, the court did not have any trouble understanding the speech of Agent Girod or Investigator Nez on the audio recording.

[64] Tr. of Evidentiary Hearing, 25:14–15.

[65] Gov. Ex. 1, at 9:18-9:33.

[66] Tr. of Evidentiary Hearing, 25:14–17.

[67] A written transcript of Nahkai's interrogation was not submitted as an exhibit for this Motion. *See* Witness & Exhibit List, docket no. 63, at 1, filed January 18, 2024.  Instead, the government filed an audio recording of Nahkai's interrogation. The exchanges between Agent Girod and Nahkai were transcribed by chambers staff from the audio recording of the interrogation.

| Timestamp | Statements |
|---|---|
| 14:30-15:25 | **Agent Girod**: Tell me about the ah massages she used to give you.<br>**Nahkai**: Oh massage, yeah. My hip right here. It was just that bucked off the horse. Ah it was hurting right here. And I-I told her to just massage right here that down here my leg right here. Going like this [indecipherable]. It got out of hand. She just slipped about. She said go like this? I said no-no-no not-not-not-not. [indecipherable] That is what I told her. [indecipherable] She was going like this. Massaging.<br>**Agent Girod**: M-hm.<br>**Nahkai:** She was just going like this. Going massaging.<br>**Agent Girod**: M-hm.<br>**Nahkai:** She just all of sudden just slipped. And I said no. Don't do it. |
| 16:56-18:05 | **Agent Girod**: Uh-huh. So here's, here's the thing. I don't believe you.<br>**Nahkai:** Huh?<br>**Agent Girod:** I don't believe you, all right? I think more happened than what you're saying. The whole massage and slip and, I know more than that happened. Okay? You, you can't convince me that more than that didn't happen. All right? I know what happened between you. Now I'm not saying you're a bad guy. Right? You're not a rapist, right? You didn't rape her.<br>**Nahkai:** uh-huh<br>**Agent Girod:** You never raped her, right?<br>**Nahkai:** No. No. No.<br>**Agent Girod:** No. But, I think some of the massages kind of went a little further than you're telling me about.<br>**Nahkai:** Uh-huh.<br>**Agent Girod:** Right?<br>**Nahkai:** Yeah.<br>**Agent Girod:** So, tell me about her touching your penis and stroking it.<br>**Nahkai:** Well, she just touch it right here and start to, what do you call it? And I said that's, don't. That's enough. I said, I keep telling her.<br>**Agent Girod:** Now, now, I know that you…<br>**Nahkai:** Yeah.<br>**Agent Girod:** You pulled it out and you had her stroke it on the skin. I know she's telling me the truth when she says that. |
| 19:11-19:25 | **Agent Girod**: So how many times did that happen.<br>**Nahkai:** One time.<br>**Agent Girod:** I don't think it happened more…it happened more than one time.<br>**Nahkai:** I'm telling the truth as God as my witness. It happened one time. |

10

| Timestamp | Statements |
|---|---|
| 23:45-24:31 | **Agent Girod:** Like I said. I don't think you're a bad guy, but I do think things got a little out of hand. And it went a little too far. And I want to help you out here. But, the thing is like this is your chance to come clean all right. This is your chance to tell the truth, about what happened.<br>**Nahkai:** I'm telling you the truth.<br>**Agent Girod:** Okay.<br>**Nahkai:** I swear.<br>**Agent Girod:** Then you need to tell me about the other times that it happened.<br>**Nahkai:** I don't . . .<br>**Agent Girod:** Tell me about the times it happened here at the house.<br>**Nahkai:** Here? Nothing happened here. Like I said only one time it happened. Not right here. |
| 24:48-25:05 | **Agent Girod:** She gave you some massages in this house, right?<br>**Nahkai:** Huh?<br>**Agent Girod:** You asked her to give you some massages while she was in this house, right?<br>**Nahkai:** Huh?<br>**Agent Girod:** Yeah?<br>**Nahkai:** No. I don't recall that at all. No. |
| 25:57-26:28 | **Agent Girod**: I mean, I, I think it's a start. But no one's going to believe you if you're not telling the whole truth. Right?<br>**Nahkai**: Yeah, I know I'm telling the truth.<br>**Agent Girod**: Because there's people that think you're a rapist, that, you know, you, you did terrible things. Right?<br>**Nahkai**: Huh?<br>**Agent Girod**: There's people out there that think you're a rapist and you did terrible things to her. But I, I don't think that. But I can't help you out if you're not telling me the whole truth, right? |
| 26:33-27:17 | **Agent Girod**: I want to be able to go and be like this guy is a good person. He is sorry for what he did. You know these are the things that happened. It didn't go beyond that. That's what I want to be able to say.<br>**Nahkai**: Mm-hm. That's what we tell her just come to my room and [indecipherable]. But I don't tell her to do this for me. Sometimes she comes, and I say no.<br>**Agent Girod**: So, there were some times in the past in the house where she would come in and try to kind of grab you and stuff and you would be like, "No. No." Is that what your selling, to me?<br>**Nahkai**: Yeah. Mm-hm.<br>**Agent Girod**: How often would that happen.<br>**Nahkai**: Not all the time. Just once in a while. |

| Timestamp | Statements |
|---|---|
| 28:15-28:39 | **Agent Girod:** And that happened a few times?<br>**Nahkai:** No. No. This is one time here and one time up there.<br>**Girard:** Okay. But, you-you just said that it happened every once in awhile.<br>**Nahkai:** Oh, no-no I mean. She would you know start punching you and hitting you and all that. That's - that's what I mean. You know. |
| 29:00-30:45 | **Nahkai:** No. I would be sitting here in the living room. Living room she would come in and start punching me like this. Start hitting me. That's when I tell her to stop now. You're making my belly bl-bl-bl-blue. But, not stroking stuff here [indecipherable]. I just told you. That's all I know.<br>**Agent Girod:** Mm-hm. Well, the thing is that I know it did happen here. And I know she stroked your penis on the skin until you ejaculated. Here in this house. That's what I know.<br>**Nahkai:** Uh-huh. [indecipherable]<br>**Agent Girod:** And that's the thing. I-I know you're not a bad guy. Right? You didn't rape her. You weren't touching her. But, I think your massages here got a little out of hand. Right? I mean you got a girl touching you on the legs and stuff like things happen. We're all guys here. That's normal.<br>**Nahkai:** Yeah that's all I know. |
| 34:30-34:58 | **Agent Girod**: I, I mean, I, I believe that those happened, but I don't think you're telling me the whole truth there. There's still things you're leaving out, and that's not going to help you at all.<br>**Nahkai:** Well, this is that the only time that these two.<br>**Agent Girod:** What about the time right before Martha retired from chapter house? When she quit working there. What about that time?<br>**Nahkai:** That's the one I was talking about when she was ten or eleven years old. |

29.     Agent Girod concluded the questioning by telling Nahkai, "All right, well uh, I think we're gonna talk with Martha here for just a second now if that's all right. You're good to go inside."[68]

30.     Nahkai then exited the vehicle and went back into his house.[69]

---

[68] Gov. Ex. 1, at 45:00-45:11.

[69] Tr. of Evidentiary Hearing, 25:22–23.

## B.    DISCUSSION

Nahkai argues his statements to officers should be suppressed because the officers subjected him to a custodial interrogation without giving him a *Miranda* warning.[70] "One is only entitled to *Miranda* warnings prior to 'custodial interrogations.' "[71] "*Miranda* thus established a two-part analysis for determining when the prescribed procedural safeguards must be provided: (1) the individual must be in custody, and (2) the individual must be subjected to questioning that meets the legal definition of interrogation."[72]

### 1.    The agents interrogated Nahkai

"A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation."[73] "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."[74]

The government states it is not necessary to determine if Nahkai was interrogated since Nahkai was not in custody when the questioning occurred.[75] The analysis of the in-custody requirement will be analyzed in Section (B)(2) of this order.

Because this order finds Nahkai was in custody, the interrogation issue is important. It is clear the agents conducted an interrogation because Agent Girod: (1) asked Nahkai about the minor's specific accusations of sexual abuse; (2) told Nahkai that he did not believe Nahkai's

---

[70] Motion to Suppress, docket no. 54, at 3-5.

[71] *United States v. Lemon*, 714 F. App'x 851, 857 (10th Cir. 2017).

[72] *United States v. Revels*, 510 F.3d 1269, 1273 (10th Cir. 2007).

[73] *Id*.

[74] *Rhode Island v. Innis*, 446 U.S. 291, 301, (1980).

[75] Government's Proposed Order, docket no. 69, at 9.

denial of the allegations; and (3) requested a confession from Nahkai numerous times during questioning. The agents clearly intended that their work elicit an incriminating response from Nahkai.

### 2. Nahkai was in custody when interrogated by officers

"To determine if someone is in custody for *Miranda* purposes, the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his situation."[76] In other words, "if a reasonable person in the suspect's position would reasonably believe her freedom of action had been curtailed to a degree associated with a formal arrest, the suspect is in custody."[77] "The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive."[78] "Whether a suspect is in custody represents an objective determination."[79] There are likely other factors related to "the suspect's position" which were not presented on this motion.[80]

The non-exhaustive factors courts use to inform a custody determination include: "(1) the extent the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will, (2) the nature of the questioning, (3) the extent police officers dominate the encounter, and (4) the release of the [suspect] at the end of the questioning."[81] While "these

---

[76] *United States v. Lemon*, 714 F. App'x 851, 857 (10th Cir. 2017).

[77] *United States v. Lemon*, 714 F. App'x 851, 857 (10th Cir. 2017).

[78] *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993).

[79] *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008).

[80] The cultural and historic background of relations between the Navajo and the United States government is fraught. The Navajo Nation is conquered, occupied, and dominated by the United States government. A long history of federal treaty making and breaking with continuing federal supervisory control colors any relationships between Navajo as a people and individuals and the federal government and its representatives. Peter Iverson, Dine: A History of the Navajos; Ruth M. Underhill, The Navajos; Susan Shown Harjo, Nation to Nation: Treaties Between the United States & American Indian Nations; James Wilson, The Earth Shall Weep: A History of Native America.

[81] *United States v. Wagner*, 951 F.3d 1232, 1250 (10th Cir. 2020) (internal quotation marks omitted) (citations omitted). Most Tenth Circuit cases that address the in-custody requirement state there are only three non-exhaustive factors, and these cases do not include "the release of the suspect at the end of questioning" as a factor for their in-

factors are useful, [courts] emphasize that [they] must look to the totality of the circumstances and consider the police-citizen encounter as a whole, rather than picking some facts and ignoring others."[82]

### i.     The agents' failure to notify Nahkai he was free to leave and to end the interview weighs in favor of finding Nahkai was in custody

The Tenth Circuit has articulated and analyzed the first factor of the four-factor test for in-custody determinations in several published opinions. Regarding the first factor, the Tenth Circuit has stated: "Our cases likewise establish the importance of telling suspects they are not under arrest and can terminate the encounter at will."[83] "That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview."[84] "Conversely, the lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention."[85] However, "it also is only one factor to consider [for an in-custody determination]."[86] Significantly, the decision whether to inform a person they are free to leave and end discussion at any time, or to tell them otherwise and give *Miranda*

---

custody determination. *See United States v. Lemon*, 714 F. App'x 851, 857 (10th Cir. 2017); *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008); *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993); *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021); *United States v. Zar*, 790 F.3d 1036, 1046 (10th Cir. 2015).

[82] *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008).

[83] *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) (citing *United States v. Chee,* 514 F.3d 1106, 1106 (10th Cir. 2008)).

[84] *United States v. Wagner*, 951 F.3d 1232, 1251 (10th Cir. 2020) (quoting *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008)).

[85] *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993); *see also United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021) (Law enforcement's failure to inform a suspect he is free to end an interview or decline to answer questions is "a significant indication of a custodial detention.").

[86] *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021) (citing *United States v. Zar*, 790 F.3d 1036, 1048 (10th Cir. 2015)).

warnings is entirely within the control of the law enforcement officer.[87] According to the Tenth Circuit, the relevant questions for the first factor, include whether law enforcement made the suspect aware that he: (1) is free to leave;[88] (2) is not under arrest;[89] (3) may refrain from answering questions;[90] or (4) may end the interview at will.[91] The agents did not do any of these four things or otherwise make Nahkai aware he was free to leave and not answer questions.

Nahkai argues that this factor should be weighed in his favor because the agents never told him he was not under arrest, that he was free to leave, or that he did not have to answer questions.[92] Nahkai reasons that Agent Nez also implied that Nahkai's compliance for questioning was required when he stated the agents "were to ask about some things."[93]

---

[87] *United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir. 1990) ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody or otherwise deprived of freedom of action . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.") (internal quotation marks and citations omitted).

[88] *United States v. Jones*, 523 F.3d 1235, 1241 (10th Cir. 2008) ("First, we consider the extent to which the suspect is *made aware* that he or she is free to refrain from answering questions or end the interview at will. . . .[The Agent] informed Jones she . . . could leave if she wanted.") (emphasis added); *United States v. Wagner*, 951 F.3d 1232, 1251 (10th Cir. 2020) ("Several non-exclusive factors inform the custody analysis: (1) the extent  . . . the suspect is *made aware* that he or she is free to refrain from answering questions or to end the interview at will . . . . [The Agent] repeatedly informed Mr. Wagner he was free to leave.") (emphasis added); *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) ("Several factors, however, have been useful in testing the atmosphere of custody. First, the extent to which the suspect is *made aware* that he or she is free to refrain from answering questions or to end the interview at will often defines the custodial setting. . . . [T]he lack of police advisement that the suspect is at  liberty to . . . free to leave is a significant indication of a custodial detention.") (emphasis added).

[89] *United States v. Jones*, 523 F.3d 1235, 1241 (10th Cir. 2008) ("[The Agent] informed Jones she . . . was not under arrest[.]"); *United States v. Wagner*, 951 F.3d 1232, 1251 (10th Cir. 2020) ("[The Agent] said he was not under arrest[.]").

[90] *United States v. Jones*, 523 F.3d 1235, 1241 (10th Cir. 2008) ("[The Agent] informed Jones she . . . did not have to talk to him[.]"); *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) ("Conversely, the lack of a police advisement that the suspect is at liberty to decline to answer questions . . .  is a significant indication of a custodial detention.") (emphasis added); *United States v. Chee*, 514 F.3d 1106, 1113 (10th Cir. 2008) ("Helpful to our analysis is whether the suspect is *made awar*e that he or she is free to refrain from answering questions[.]") (emphasis added).

[91] *United States v. Wagner*, 951 F.3d 1232, 1251 (10th Cir. 2020) ("That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview."); *United States v. Chee*, 514 F.3d 1106, 1113 (10th Cir. 2008) ("Helpful to our analysis is whether the suspect is made aware that he or she is free to . . . end the interview at will[.]").

[92] Nahkai's Proposed Order, at 12.

[93] Nahkai's Proposed Order, at 12.

The government acknowledges that the officers did not notify Nahkai he was free to leave or end the interview, but the government still argues this factor should be weighed in its favor since other five other facts show a "defendant reasonably felt he was free to leave[.]"[94] Specifically, the government argues: (1) the exit for the closed vehicle door was obvious and easily accessible; (2) the agents did not use physical restraints; (3) the agents did not threaten to arrest Nahkai; (4) the agents questioned Nahkai on his property; and (5) Nahkai consented to entering the vehicle to speak with the agents.[95] But the Tenth Circuit's legal standard for the first factor used for in-custody determinations is whether the defendant *was made aware by law enforcement* that he was free to leave and terminate the interview.

As stated above, in the Tenth Circuit the relevant questions for the first factor include whether law enforcement told the suspect that he: (1) is free to leave;[96] (2) is not under arrest;[97]

---

[94] Government's Proposed Order, at 10. How the defendant "reasonably felt" is a reference to the overall legal standard for custodial interrogations, not a reference to the legal standard for whether Nahkai was notified that he was free to leave and end the interview.

[95] Government's Proposed Order, docket no. 69, at 10-11 (citing *United States v. Berres*, 777 F.3d 1083, 1092 (10th Cir 2015; *United States v. Jones*, 523 F.3d 1235, 1241 (10th Cir. 2008); *United States v. Zar*, 790 F.3d 1036, 1048 (10th Cir. 2015)); Tr. of Second Hearing, docket no. 81, at 47:13-48:1.

[96] *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) ("First, we consider the 'extent to which the suspect is *made aware* that he or she is free to refrain from answering questions or to end the interview at will' . . . [The Agent] informed Jones she . . . could leave if she wanted.") (emphasis added); *United States v. Wagner*, 951 F.3d 1232, 1251 (10th Cir. 2020) ("Four factors support this conclusion [that the interview with Mr. Wagner was not custodial]. . . . First, [the Agent] repeatedly *informed* Mr. Wagner he was free to leave."); *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) ("Several factors, however, have been useful in testing the atmosphere of custody. First, the extent to which the suspect is *made aware* that he or she is free to refrain from answering questions or to end the interview at will often defines the custodial setting. . . . [T]he lack of police *advisement* that the suspect is. . . free to leave is a significant indication of a custodial detention.") (emphasis added).

[97] *United States v. Jones*, 523 F.3d 1235, 1241 (10th Cir. 2008) ("[The Agent] informed Jones she . . . was not under arrest[.]"); *United States v. Wagner*, 951 F.3d 1232, 1251 (10th Cir. 2020) ("[The Agent] said he was not under arrest[.]").

(3) may refrain from answering questions;[98] or (4) may end the interview at will.[99] These factors are supported by considerable Tenth Circuit authority.

*United States v. Jones* provides an example of how the Tenth Circuit analyzes the first factor for in-custody determination. In *Jones,* the Tenth Circuit concluded the first factor weighed against finding that suspect was in-custody because the agent:

> informed Jones she was not under arrest, did not have to talk to him, and could leave if she wanted. He specifically motioned to the door on Jones's side of the car and made sure it was unlocked. A bit later in the encounter, [the agent] again told Jones she was free to leave.[100]

When analyzing the first factor, the Tenth Circuit did not consider any of the five facts on which the government relies.[101] Additionally, the Tenth Circuit stated the location of the conversation and the suspect's voluntary decision to accompany police were relevant for the in-custody determination, but these facts were relevant for the third factor involving police domination, not the first factor as the government argues.[102] In *United States v. Jones,* the Tenth Circuit analyzed whether the agent's statement that "he had enough to arrest" the defendant  undermined the

---

[98] *United States v. Jones*, 523 F.3d 1235, 1241 (10th Cir. 2008) ("[The Agent] informed Jones she . . . did not have to talk to him[.]"); *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) ("Conversely, the lack of a police advisement that the suspect is at liberty to decline to answer questions . . .  is a significant indication of a custodial detention."); *United States v. Chee*, 514 F.3d 1106, 1113 (10th Cir. 2008) ("Helpful to our analysis is whether the suspect is made aware that he or she is free to refrain from answering questions[.]").

[99] *United States v. Wagner*, 951 F.3d 1232, 1251 (10th Cir. 2020) ("That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview."); *United States v. Chee*, 514 F.3d 1106, 1113 (10th Cir. 2008) ("Helpful to our analysis is whether the suspect is made aware that he or she is free to . . . end the interview at will[.]").

[100] *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008).

[101] *Compare United States v. Jones*, 523 F.3d 1235, 1240-41 (10th Cir. 2008) (not stating any of the government's five factors in its analysis of whether the suspect was aware he was free to leave), *with* Government's Proposed Order, docket no. 69, at 10-11 (stating the first factor should be weighed in the government's favor because: (1) the exit for the closed vehicle door was obvious and easily accessible; (2) the agents did not use physical restraints; (3) the agents did not threaten to arrest Nahkai; (4) the agents questioned Nahkai on his property; and (5) Nahkai consented to entering the vehicle to speak with the agents).

[102] *United States v. Jones*, 523 F.3d 1235, 1242 (10th Cir. 2008); Government's Proposed Order, docket no. 69, at 10 (arguing incorrectly that the consensual nature of the conversation and the fact the vehicle was parked in front of Nahkai's house support weighing the first factor in the government's favor).

agent's earlier statements that the defendant was not under arrest, did not have to talk to him, and could leave if the defendant wanted.[103] However, this threat was only relevant to the inquiry into the first factor because the defendant argued the agent's threat that "he had enough to arrest" her invalidated the earlier statement that she was not under arrest.[104] This threat of arrest would not have been part of the analysis for the first factor without the agent's earlier statements that the defendant was not under arrest, did not have to talk to him, and she was free to leave. *United States v. Jones* does not hold that the absence of threats is a substitute for informing the suspect that she is free to leave, not under arrest, and did not have to speak with police.

*United States v. Wagner* provides another example of how the Tenth Circuit analyzes the first factor for an in-custody determination.[105] In *Wagner* the Tenth Circuit concluded the first factor weighed against finding that suspect was in-custody because:

> [The Agent] repeatedly informed [the defendant] he was free to leave.  [The Agent] said he was not under arrest, that he was "free to leave at any time," and that he would not be "going with [them] today." That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview.[106]

Once again, when analyzing the first factor, Tenth Circuit did not consider any of the five reasons the government used in its Proposed Order for this Suppression Motion.[107] The Tenth Circuit

---

[103] *Jones*, 523 F.3d at 1240.

[104] *Jones*, 523 F.3d at 1240-41 ("Jones seeks to undercut the importance of Agent Bridge's statements—informing her she did not have to talk to him—by focusing on Bridge's comment he could arrest her based on the iodine package. She argues a reasonable person would not feel at liberty to terminate the encounter in light of two seemingly contradictory statements: (1) not under arrest, but (2) could be arrested.").

[105] *United States v. Wagner*, 951 F.3d 1232 (10th Cir. 2020).

[106] *United States v. Wagner*, 951 F.3d 1232, 1251 (10th Cir. 2020).

[107] *Compare United States v. Wagner*, 951 F.3d 1232, 1251 (10th Cir. 2020) (omitting all of the government's five factors from its analysis of whether the suspect was made aware he was free to leave), *with* Government's Proposed Order, docket no. 69, at 10-11 (stating the first factor should be weighed in the government's favor because: (1) the exit for the closed vehicle door was obvious and easily accessible; (2) the agents did not use physical restraints; (3) the agents did not threaten to arrest Nahkai; (4) the agents questioned Nahkai on his property; and (5) Nahkai consented to entering the vehicle to speak with the agents);

focused on how the suspect was informed. Additionally, in *United States v. Wagner*, the Tenth Circuit stated that whether the agents made physical contact with the defendant was relevant for the in-custody determination. However, the Tenth Circuit stated this fact was relevant for the third factor involving police domination, not the first factor, as the government argues.[108] The government argued the "lack of physical restraints" supports weighing the first factor in its favor, and did not specifically assert that the "lack of physical contact by the agents" supports weighing the first factor in its favor.[109] But, the phrase "lack of physical contact" is broad enough to include the phrase "lack of physical restraints." The lack of physical restraints is not a means of informing a suspect.

The government also cited to *United States v. Berres* to support the proposition that the lack of restraints was evidence that Nahkai was notified he was free to leave and not answer questions. *Berres* did not conclude that the lack of physical restraints supports finding that Nahkai was made aware that he was free to leave.[110] In *Berres*, the Tenth Circuit noted the lack of physical restraints was evidence the interrogation was not custodial, but the Tenth Circuit did not state the lack of physical restraints was relevant to whether the suspect was made aware he could end the interview.[111]

*United States v. Zar* does not support the government's argument that the consensual nature of the conversation between agents and the suspect is relevant in whether the suspect is notified by law enforcement that he is free to leave and not answer questions. Specifically, the

---

[108] *Compare United States v. Wagner*, 951 F.3d 1232, 1250-51 (10th Cir. 2020) ("Officers may 'dominate' an encounter by displaying a weapon, making physical contact, isolating the suspect in a police-controlled environment, or appearing in overwhelming numbers."), *with* Government's Proposed Order, docket no. 69, at 10.

[109] Government's Proposed Order, docket no. 69, at 10

[110] *United States v. Berres*, 777 F.3d 1083, 1092 (10th Cir 2015).

[111] *See United States v. Berres*, 777 F.3d 1083, 1092 (10th Cir 2015).

government argues the agents' consensual conversation with Nahkai, like the suspect's conversation with agents in *Zar*, supports its argument that Nahkai was made aware he was free to leave.[112] However, in *Zar*, the Tenth Circuit never stated that a consensual conversation between law enforcement and a suspect was relevant when analyzing the first factor.[113] In *Zar*, the district court held the suspect was not in custody and the Tenth Circuit affirmed the lower court because the suspect: (1) invited the agents inside the house; and (2) the suspect's mother was present during the entire interview.[114] The Tenth Circuit concluded that Mr. Zar was not subject to custodial interrogation, but the Tenth Circuit never concluded that Mr. Zar was made aware he was free to leave and end the interview.[115]

There is language in *United States v. Zar* which can be misinterpreted to support the government's position.[116] *Zar* stated the first factor was: "whether the suspect was *aware* that she could refrain from answering questions or end the interview at will[.]"[117] This articulation of the first factor is not precisely correct because: (1) it omits any reference to the "*police making the*

---

[112] Government's Proposed Order, docket no. 69, at 10 ("Many other facts can show a defendant reasonably felt free to leave, including . . . the consensual nature of the conversation. When a conversation is consensual, law enforcement is not required to advise the suspect of this fact.") (citing *United States v. Zar*, 790 F.3d 1036, 1048 (10th Cir. 2015)).

[113] *Zar*, 790 F.3d at 1047-48.

[114] *United States v. Zar*, 790 F.3d 1036, 1046-47, 1048 (10th Cir. 2015) ("And although I would agree with some courts that have observed the failure to reaffirm that this was a consensual conversation is probably not good practice on the part of the investigating agents, it doesn't change the fact that Mr. Zar invited them into the house after he had previously closed the door to evaluate the situation. . . . Any concerns about [the defendant being ill-equipped to deal with two law enforcement officers] are relieved by the fact that his mother was present during the entirety of the interview, and there has been no information as to her inability to perceive or be familiar with what was going on during the interview.").

[115] *United States v. Zar*, 790 F.3d 1036, 1048 (10th Cir. 2015) ("[W]e are troubled by the agents' failure to advise the Zars that the interview was a consensual conversation. But the agents were not required to do so, and as the district court noted, this factor alone did not transform the in-home interview into a custodial interrogation. Rather, as the district court concluded, under the totality of the circumstances the Zars were not in custody during the interview.").

[116] *United States v. Zar*, 790 F.3d 1036, 1046 (10th Cir. 2015).

[117] *United States v. Zar*, 790 F.3d 1036, 1046 (10th Cir. 2015) (emphasis added).

*suspect aware*" that she could refrain from answering questions or end the interview at will; (2) Tenth Circuit cases that came before and after *Zar* have consistently held that first factor is *whether police made the suspect aware* that: she was free to leave;[118] she was not under arrest;[119] she may refrain from answering questions;[120] or she may end the interview at will;[121] and (3) the cursory articulation of the first factor in *Zar* gives the false impression that the first factor is based on the suspect's *state of mind* instead of on *notifications* by police. The language in *Zar* is likely why the government's proposed order states: "The first factor looks at whether a suspect is made aware *or would reasonably feel free to terminate* an interview with law enforcement."[122]

Therefore, this factor is weighed in favor of finding Nahkai was in-custody because the agents failed to make Nahkai aware he was free to leave and end the interview.

---

[118] *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) ("First, we consider the extent to which the suspect is *made aware* that he or she is free to refrain from answering questions or end the interview at will. . . . [The Agent] informed Jones she . . . could leave if she wanted.") (emphasis added); *United States v. Wagner*, 951 F.3d 1232, 1250-1251 (10th Cir. 2020) ("Several non-exclusive factors inform the custody analysis: (1) the extent . . . the suspect is *made aware* that he or she is free to refrain from answering questions or to end the interview at will . . . . [The Agent] repeatedly *informed* Mr. Wagner he was free to leave.") (emphasis added); *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) ("Several factors, however, have been useful in testing the atmosphere of custody. First, the extent to which the suspect is *made aware* that he or she is free to refrain from answering questions or to end the interview at will often defines the custodial setting. . . .[T]he lack of a police advisement that the suspect is . . . free to leave is a significant indication of a custodial detention.") (emphasis added).

[119] *United States v. Jones*, 523 F.3d 1235, 1241 (10th Cir. 2008) ("[The Agent] informed Jones she . . . was not under arrest[.]"); *United States v. Wagner*, 951 F.3d 1232, 1251 (10th Cir. 2020) ("[The Agent] said he was not under arrest[.]").

[120] *United States v. Jones*, 523 F.3d 1235, 1241 (10th Cir. 2008) ("[The Agent] informed Jones she . . . did not have to talk to him[.]"); *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) ("Several factors, however, have been useful in testing the atmosphere of custody. First, the extent to which the suspect is *made aware* that he or she is free to refrain from answering questions or to end the interview at will often defines the custodial setting. Conversely, *the lack of a police advisement* that the suspect is at liberty to decline to answer questions . . . is a significant indication of a custodial detention.") (emphasis added); *United States v. Chee*, 514 F.3d 1106, 1112-13 (10th Cir. 2008) ("Helpful to our analysis is whether the suspect is *made aware* that he or she is free to refrain from answering questions or to end the interview at will[.]").

[121] *United States v. Wagner*, 951 F.3d 1232, 1251 (10th Cir. 2020) ("That a person is *told repeatedly* that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview."); *United States v. Chee*, 514 F.3d 1106, 1113 (10th Cir. 2008) ("Helpful to our analysis is whether the suspect is *made aware* that he or she is free to . . . end the interview at will[.]").

[122] *See United States v. Zar*, 790 F.3d 1036, 1046 (10th Cir. 2015); Government's Proposed Order at 10-11 (emphasis added).

### ii. The accusatory nature of the questioning weighs in favor of finding Nahkai was in custody

The second factor indicative of a custodial setting is "the nature of questioning."[123] "[P]rolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave."[124] "This factor combines multiple aspects of the agents' conduct: the substance of the questions they asked, the way the agents asked those questions, and the length of their encounter with the interviewee."[125] In *United States v. Jones*, the Tenth Circuit held the questioning was not prolonged when it lasted between 45 minutes to one hour.[126] These agents questioned Nahkai for 41 minutes.[127] However, Agent Girod's accusatory questioning supports a finding Nahkai was in custody because the questioning was: (1) similar to the questioning in *United States v. Guillen* where the Tenth Circuit held the questioning weighed in favor in finding custody, and (2) more accusatory than the questioning in *United States v. Archuleta* where the District of Utah found the officer "engaged in a highly coercive line of questioning" and the questioning weighed "heavily in favor of finding that Archuleta was in custody."[128]

The Tenth Circuit's opinion in *United States v. Guillen* found the questioning by agents to be accusatory in nature, and the Tenth Circuit weighed this factor in favor of finding Guillen

---

[123] *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993).

[124] *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993); *see also U.S. v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008).

[125] *United States v. Dantzson*, No. 22-CR-40077-TC, 2023 WL 5672707, at *4 (D. Kan. Sept. 1, 2023) (citing *United States v. Wagner*, 951 F.3d 1232, 1250 (10th Cir. 2020), *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993)).

[126] *U.S. v. Jones*, 523 F.3d 1235, 1238 (10th Cir. 2008).

[127] Government's Proposed Order, docket no. 69, at 12.

[128] *United States v. Guillen*, 995 F.3d 1095 (10th Cir. 2021); *United States v. Archuleta*, 981 F.Supp.2d 1080, 1093 (D. Utah 2013).

was in custody. In *Guillen*, the agents were searching Guillen's residence for evidence that Guillen made the pressure cooker bomb that was found at his ex-girlfriend's house.[129] Two agents questioned Guillen at his kitchen table "for about 50 minutes, during which time Guillen repeatedly denied any involvement with making the pressure cooker bomb."[130] After the search ended, the agents asked Guillen to return to the kitchen table, and one of the agents informed Guillen:

> We know that you purchased a pressure cooker and it's gone. We know that a soldering iron was used in this device, and your dad's soldering iron is missing. White tape, like was found on the device, is found in the backpack. And there's a table that looks like it has black powder burns, and there's burns and fuses on that table.[131]

The agent informed Guillen the evidence pointed to him, and the agent again asked Guillen if he made the pressure cooker bomb.[132] Guillen hesitated and confessed to making the bomb.[133] After this occurred, the agent immediately issued a *Miranda* warning.[134]

In analyzing the nature of the questioning, the Tenth Circuit reasoned: "Whether the nature and length of the agents' questioning was accusatory or coercive is a closer call [than whether Guillen was questioned in a police-dominated atmosphere]."[135] The Tenth Circuit acknowledged there were facts that suggested the questioning was not coercive because: (1) the

---

[129] *Guillen*, 995 F.3d at 1100-1101.

[130] *Id.* at 1102.

[131] *Id.* at 1110.

[132] *Id.* at 1102.

[133] *Id.* at 1102.

[134] *Id.* at 1102.

[135] *United States v. Guillen*, 995 F.3d 1095, 1109-1110 (10th Cir. 2021) (finding that the defendant was not subjected to a police-dominated atmosphere). The Tenth Circuit concluded the environment was not dominated by law enforcement because: (1) the agents obtained voluntary consent to enter the Guillen residence; (2) Guillen was questioned at his kitchen table; (3) Guillen's father participated in the interview at least once; (4) Guillen was not placed in handcuffs or physically restrained; and (5) Guillen was never subjected to or threatened with any physical mistreatment. *United States v. Guillen*, 995 F.3d 1095, 1109-1110 (10th Cir. 2021).

questioning was not conducted over an especially long period of time before the *Miranda* warning was issued; and (2) the agents did not speak in a threatening tone nor display their weapons during the questioning.[136] Despite these facts in the early interrogation, the Tenth Circuit concluded that later interrogation was accusatory:

> Under the totality of the circumstances described above, [Guillen] was not in custody before Agent Rominger confronted him with the information and evidence discovered during the search. But the situation evolved when Agent Rominger pressed Ethan despite his repeated denials of involvement and then confronted him with the mounting information and evidence collected during the search. At that point, a reasonable person in Ethan's position would not have felt free to leave or otherwise end the interview. [137]

The Tenth Circuit also emphasized that the evidence the agents discovered supported its in-custody determination:

> It is difficult to ignore the effect that [the agent's] accusatory questioning had on the nature of the interrogation under the circumstances [Guillen] faced. . . . Considering the evidence the agents had discovered, an arrest was likely, and— after being confronted with that evidence—a reasonable person in [Guillen's] shoes would have recognized as much. Thus, [Guillen] would have reasonably understood his situation as the functional equivalent of formal arrest when Agent Rominger elicited his initial confession.[138]

Guillen's initial confession was suppressed, though later statements made after *Miranda* warnings were not suppressed.

The questioning in *United States v. Guillen* is similar to the questioning to which Nahkai was subjected. Specifically, both cases had facts that suggested the questioning was not coercive or accusatory, such as: (1) the questioning occurring over a short period of time; and (2) the agents spoke in a non-threatening tone for at least part of the questioning.[139] But, in both cases,

---

[136] *Id.* at 1109-1110.

[137] *Id.* at 1110-11.

[138] *Id.* at 1111.

[139] *United States v. Guillen*, 995 F.3d 1095, 1110 (10th Cir. 2021).

the agents accused the suspect of committing a serious crime.[140] Agent Girod may not have confronted Nahkai with the same type of physical evidence as the agents in *Guillen*, but Agent Girod engaged in persistent accusatory questioning. Specifically, Agent Girod stated that: (1) he knew certain facts that constituted crimes occurred; (2) the agents did not believe Nahkai's denials, but instead the accuser's claims; and (3) other people believed Nahkai raped the accuser, but Agent Girod did not believe that occurred.[141]

The government argues *United States v. Guillen* is distinguishable.[142] Specifically, the government argued the Tenth Circuit in *Guillen* found the questioning to be accusatory because "no reasonable person in Mr. Guillen's circumstance would believe he was free to leave. And he was not, Your Honor. He was arrested."[143] The fact that Mr. Guillen was arrested after the interrogation took place is *not relevant* to whether the questioning in *Guillen* was accusatory and likely to create a coercive environment.

The government also finds *Guillen* distinguishable because of how evidence unrolled before the suspect:

> Mr. Nahkai was questioned about one testimonial past accusation. There was no mounting evidence presented to Mr. Nahkai. . . . If, perhaps, this case had involved agents entering the Nahkai residence and finding a videotape of Mr. Nahkai assaulting the victim in this case, and then had confronted him, then *Guillen* might look like persuasive authority.[144]

---

[140] *Id.* at 1102.

[141] The Eighth Circuit has noted that: "Although custody is not inferred from the mere circumstance that the police are questioning the one whom they believe to be guilty, the fact that the individual has become the focus of the investigation is relevant 'to the extent that the suspect is aware of the evidence against him' and this awareness contributes to the suspect's sense of custody." *United States v. Griffin*, 922 F.2d 1343, 1348 (8th Cir. 1990).

[142] Second Hearing Transcript, docket no. 81, at 48:16-51:12.

[143] Second Hearing Transcript, docket no. 81, at 50:13-15.

[144] Second Hearing Transcript, docket no. 81, at 50:17-25.

The relevant issue is whether the questioning is accusatory and coercive, not whether the officers used physical evidence during the questioning. The questioning between Agent Girod and Nahkai had the following accusatory exchanges:

> **Agent Girod**: I don't believe you, all right? I think more happened than what you're saying. The whole massage and slip and, I know more than that happened. Okay? You, you can't convince me that more than that didn't happen. All right? I know what happened between you. Now I'm not saying you're a bad guy. Right? You're not a rapist, right? You didn't rape her.
> **Nahkai**: uh-huh
> **Agent Girod:** You never raped her, right?
> **Nahkai:** No. No. No.
>
> **Agent Girod**: So, tell me about her touching your penis and stroking it.
> **Nahkai**: Well, she just touch it right here and start to, what do you call it? And I said that's, don't. That's enough. I said, I keep telling her.
> **Agent Girod**: Now, now, I know that you…
> **Nahkai**: Yeah.
> **Agent Girod**: You pulled it out and you had her stroke it on the skin. I know she's telling me the truth when she says that.
>
> **Agent Girod**: I mean, I, I think it's a start. But no one's going to believe you if you're not telling the whole truth. Right?
> **Nahkai**: Yeah, I know I'm telling the truth.
> **Agent Girod**: Because there's people that think you're a rapist, that, you know, you, you did terrible things. Right?
> **Nahkai**: Huh?
> **Agent Girod**: There's people out there that think you're a rapist and you did terrible things to her. But I, I don't think that. But I can't help you out if you're not telling me the whole truth, right?
>
> **Nahkai:** No. I would be sitting here in the living room. Living room she would come in and start punching me like this. Start hitting me. That's when I tell her to stop now. You're making my belly bl-bl-bl-blue. But, not stroking stuff here [indecipherable]. I just told you. That's all I know.
> **Agent Girod:** Mm-hm. Well, the thing is that I know it did happen here. And I know she stroked your penis on the skin until you ejaculated. Here in this house. That's what I know.

The successive revelations of additional facts are accusatory. Agent Girod specifically and repeatedly accused Nahkai of committing serious crimes by stating he knew certain criminal conduct occurred. Additionally, the questioning was coercive because one of

Agent Girod's statements implied if Nahkai did not confess to a serious crime now, other people would charge him with more serious crimes later.[145]

Agent Girod's questioning of Nahkai was *far* more accusatory than the questioning in *United States v. Archuleta*, where the District of Utah concluded the nature of the questioning "weigh[ed] heavily in favor of finding that Archuleta was in custody."[146] In *Archuleta*, during a traffic stop, the police officer asked Archuleta about: (1) the contents of Archuleta's bag even though it had nothing to do with the stop; (2) Archuleta's gun and whether he was in possession of a gun; (3) Archuleta's criminal history and drug use; and (4) if Archuleta currently was in possession of drugs.[147] The District of Utah Court reasoned: "The court finds this line of questioning  and course of action coercive. . . . Each successive question about drug use piled more pressure on Archuleta to answer."[148] Although Agent Girod did not use handcuffs, search Nahkai's person, or confiscate any firearms like the officer in *Archuleta*, all of which weighed in favor of finding custody, Agent Girod's *questioning* was *accusatory*; the questioning created a coercive environment; and this factor weighs in favor of finding that Nahkai was in custody.[149]

The government argued that the facts of *Archuletta* are entirely different from the facts of Nahkai's case.[150] But the facts in *Archuletta* on which the government relied (i.e., touching, lack of restraints, and location) are relevant for the third factor for police

---

[145] Gov. Ex. 1, at 25:57-26:28 ("There's people out there that think you're a rapist and you did terrible things to her. But I, I don't think that. But I can't help you out if you're not telling me the whole truth, right?").

[146] *United States v. Archuleta*, 981 F. Supp. 2d 1080, 1093 (D. Utah 2013), *aff'd*, 619 F. App'x 683 (10th Cir. 2015).

[147] *Archuleta*, 981 F. Supp. 2d at 1092.

[148] *Archuleta*, 981 F. Supp. 2d at 1092.

[149] *Id.* (concluding that the officer's questions and actions of handcuffing, searching, and confiscating a firearm created a coercive environment from which a reasonable person would not feel free to leave).

[150] Second Hearing, at 51:15-17 ("And this non-binding authority, the facts are just so disparate that, frankly, there's really no comparative power.").

domination, not the issue of accusatory questioning.[151] *Archuleta* is cited only to analyze whether the questioning of Nahkai was accusatory and coercive. While certain facts may affect multiple factors for the in-custody analysis, the "totality of the circumstances" test is only used to determine if the suspect was in-custody during the interrogation, and this test does not apply to each of the individual four factors.[152]

### iii. Police domination of the encounter weighs in favor of finding Nahkai was in custody

The third factor that courts analyze to determine if a suspect was in-custody for *Miranda* purposes is "the extent police officers dominate the encounter."[153] "Where police are in full control of the questioning environment, custody is more easily found."[154] The Tenth Circuit uses six guideposts to determine if police dominated an encounter with a defendant:

> [(1)]Separation of the suspect from family or colleagues who could offer moral support; [(2)] isolation in nonpublic questioning rooms; [(3)] threatening presence

---

[151] Second Hearing, at 52:5-53:5. (During the second hearing, the government argued, "[a]n individual who is handcuffed, searched, and subjected to seizure of his personal property is in a very different situation as to the questions that can be asked and answered that might result in a coercive situation. Mr. Nahkai, as the Court is well aware, had none of the above happen. Which is to say, Mr. Nahkai was – Agent Girod and CI Nez did none of those things. They never even touched Mr. Nahkai. . . . They never searched him. They never touched him. They never cuffed him. They never restrained him. So not surprisingly given the paucity or absence of any police dominance or force, they were afforded a greater leash in discussing the case with Mr. Nahkai than the officers who handcuffed, searched, frisked, seized Mr. Archuletta. It's simply not a persuasive case. In addition, it happens in a different place. Mr. Nahkai was not stopped for traffic. . . . Mr. Nahkai, unlike Mr. Archuletta, could see his own home throughout the entirety of the questioning. Nobody ever took anything from him. And not surprisingly, Mr. Nahkai walked voluntarily back to his home after his questions, unlike Mr. Archuletta, who was arrested.").

[152] *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) ("The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive. In the past, we have avoided hard line rules to govern this analysis, and our opinion today should not be interpreted as an exhaustive pronouncement. Several factors, however, have been useful in testing the atmosphere of custody."); *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) ("The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive. We thus avoid hard line rules and instead allow several non-exhaustive factors to guide us."); *United States v. Zar*, 790 F.3d 1036, 1046 (10th Cir. 2015) ("Courts consider several factors to determine whether, under the totality of the circumstances, a reasonable person would have understood her situation as one akin to formal arrest."); *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021) ("An individual is in custody for *Miranda* purposes when a reasonable person in the suspect's position would understand his or her situation as the functional equivalent of formal arrest. This is an objective, fact-intensive inquiry that focuses on the totality of the circumstances. Some relevant factors inform our analysis. . . .").

[153] *United States v. Wagner*, 951 F.3d 1232, 1250 (10th Cir. 2020).

[154] *United States v. Griffin*, 7 F.3d 1512, 1518-19 (10th Cir. 1993) (emphasis added).

of several officers; [(4)] display of a weapon by an officer; [(5)] physical contact with the subject; and [(6)] an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.[155]

The government argues that the agents did not dominate the encounter because: (1) Nahkai was only confronted by two officers in a non-aggressive fashion; (2) only one of the two agents had a visible weapon; (3) the officers never took steps to show force or indicate Nahkai had been taken into custody; (4) Nahkai was not handcuffed, searched, or touched in any way; (5) the agents traveled in unmarked vehicles; (6) the vehicle where the questioning occurred was publicly parked; (7) Ms. Nahkai voluntarily opened the gate and let the agents on the property; (8) the agents politely requested for the interview to take place in Agent Girod's truck and Nahkai voluntarily complied; and (9) Nahkai was seated in the front passenger seat of the truck during questioning.[156]

Nahkai argues that the atmosphere was police dominated because: (1) the officers separated Nahkai from his wife before interrogating him; (2) the interrogation occurred in a law enforcement vehicle, which is smaller than the typical interrogation room; (3) the interrogation occurred in an isolated and remote area; (4) Nahkai had an officer to his left and another immediately behind him in a police vehicle; and (5) the agents told Nahkai they did not believe him during the interview.[157]

The Tenth Circuit's opinion in *United States v. Fred* establishes that these agents dominated the encounter with Nahkai.[158] In *Fred*, Fred's daughter told a counselor at a detention

---

[155] *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) (citing *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir.1993)).

[156] Government's Proposed Order, docket no. 69, at 12-14.

[157] Defendant's Proposed Order, docket no. 72, at 18-19.

[158] *United States v. Fred*, 322 F. App'x 602 (10th Cir. 2009).

center Fred had touched her in a sexually inappropriate way.[159] Later, Fred and his wife were

contacted by social services and informed they would need to speak with the FBI regarding their

daughter's accusation that Fred touched the daughter in a sexually inappropriate way.[160] Fred

was interviewed by two FBI agents at an FBI office's conference room after Fred and his wife

traveled to the FBI office without an appointment.[161] The two agents were dressed casually, but

their weapons and badges were visible.[162] Fred wanted his wife to accompany him during the

interview because he mostly spoke Navajo, and she was better at speaking English.[163] However,

the agents would not allow Fred's wife to enter the interview room.[164] At the start of the

interview, the agents thanked Fred for coming to the interview voluntarily; told him he was not

going to be under arrest; and informed him he could leave *when they were done*.[165]

The agents interviewed Fred for about 90 minutes, and Fred's interview was not

recorded.[166] One FBI agent testified at the suppression hearing that Fred stated during the

interview that he touched his daughter in inappropriate ways on two occasions, and then Fred

went into detail on what he did on those occasions.[167] The district court determined that Fred was

not in custody when he was interviewed and *Miranda* warnings were not required prior to law

enforcement's questioning.[168]

---

[159] *United States v. Fred*, 322 F. App'x 602, 603 (10th Cir. 2009).

[160] *Id.* at 603, 607.

[161] *Id.* at 606.

[162] *Id.* at 603.

[163] *Id.* at 603-604.

[164] *United States v. Fred*, 322 F. App'x 602, 604 (10th Cir. 2009).

[165] *Id.* at 606-607.

[166] *Id.* at 604.

[167] *Id.*

[168] *Id.*

The Tenth Circuit reversed and held Fred's statements should have been suppressed because of the first, second, and third factors.[169] As to the first factor, the Tenth Circuit reasoned that the agent's statement that Fred could leave, "when [we are] done here" resonates as a form of compulsion that Fred would not be able to leave until he talked.[170] As to the second factor regarding accusatory and coercive questioning, the Tenth Circuit noted the interview lasted between 90 minutes and two hours.[171] As to the third factor regarding whether the encounter was dominated by police, the Tenth Circuit concluded that the encounter was dominated by police because: (1) the agents' weapons and badges were visible when they interviewed Fred; (2) Fred's wife was denied the opportunity to accompany him during the interview; and (3) Social Services had notified Fred that his daughter had accused him of touching her inappropriately and Fred understood that the subject of his conversations with the FBI could be those potentially criminal accusations.[172] The Tenth Circuit also indicated the agents dominated the encounter because: (1) Fred was in an enclosed space with the officers, and while the hallway door was allegedly open, he was seated in a position where he could not see the open door; and (2) Fred and his wife passed through metal detectors at the entrance of the FBI building.[173]

Nahkai's encounter was dominated by law enforcement for several reasons. First, officers initiated the contact by coming to Nahkai's home unannounced.[174] Second, while the home and yard were readily available locations for a discussion, the officers directed

---

[169] *See United States v. Fred*, 322 F. App'x 602, 605 (10th Cir. 2009).

[170] *Id.* at 607.

[171] *Id.* at 607.

[172] *Id.*

[173] *Id.*

[174] *United States v. Erving L.*, 147 F.3d 1240, 1247 (10th Cir. 1998) (noting the atmosphere was not dominated by police, in part, because they called ahead and indicated they wished to speak with the defendant about possible sexual abuse).

Nahkai to enter their vehicle. The interrogation took place in an unmarked police vehicle in an area that was isolated and private. These first two reasons demonstrate that the agents were in "full control" of the time and place of the encounter.[175]

The government argued the location of the interview does not support a finding of police domination because the questioning occurred on Nahkai's property.[176] But the questioning occurred in the police vehicle at Agent Girod's direction, and Nahkai's <u>immediate surroundings</u> during questioning was a police vehicle with two law enforcement agents in close proximity. The agents chose one of their vehicles for the questioning instead of Nahkai's house or the front yard.[177]

Third, Investigator Nez's gun was displayed during the encounter, and Investigator Nez's shirt had a law enforcement star on it that serves as a functional equivalent of a badge.[178] Agent Girod was in civilian clothing and his gun was hidden, but if one officer has a visible gun and badge on his person, a reasonable person would assume the other officer had a gun and badge on his person, even if these items were not

---

[175] *United States v. Griffin*, 7 F.3d 1512, 1518-19 (10th Cir. 1993) ("Where police are in full control of the questioning environment, custody is more easily found.").

[176] Government Proposed Order, at 14; Tr. of Third Hearing, at 50:17-20 ("Well, Mr. Nahkai was not brought to an isolated place. Mr. Nahkai was literally feet from the front door of his house, that was visible throughout. His house. He wasn't brought around back.").

[177] *United States v. Hatathle*, No. 2:07-CR-814 TS, 2008 WL 4642963, at *7 (D. Utah Oct. 17, 2008) (noting the agent asked the defendant to speak in the vehicle, which was away from the barking dogs); *see also United States v. Jones*, 523 F.3d 1235, 1242 (10th Cir. 2008) (noting it was perfectly sensible for the agent to be cognizant of the defendant's privacy and ask to speak inside his car, thus preventing passersby near the gas station from learning about the defendant's methamphetamine use).

[178] Tenth Circuit authority suggests that the term "display" in this context means visible or unconcealed. *United States v. Fred*, 322 F. App'x 602, 604, 697 (10th Cir. 2009) (concluding that the guns were "displayed" after finding the guns were "visible"); *United States v. Guillen*, 995 F.3d 1095, 1105 (10th Cir. 2021) (concluding the environment was not dominated by the agents and the agents kept their weapons concealed); *United States v. Jones*, 523 F.3d 1235, 1238, 1242 (10th Cir. 2008) (noting that the agents weapons were "concealed" and later noting that the agents' guns were not "displayed").

visible on the second officer.[179] The Tenth Circuit has held on multiple occasions that the display of a badge or firearm supports a finding of police domination.[180]

Fourth, Nahkai's wife, Martha, was denied the opportunity to accompany Nahkai to the interview, and the agents separated Martha from her husband. Specifically, when Investigator Nez asked Martha if they could speak with Nahkai, she responded with: "Just him?" In response, Investigator Nez stated they wanted to speak with Nahkai first, and they would talk with her later. Investigator Nez's response and the decision to conduct the interrogation in a police vehicle effectively denied her the ability to be present.

Fifth, Nahkai was aware that his niece accused him of inappropriate sexual contact and the questioning would relate to "potentially criminal accusations" that the Tenth Circuit held in *United States v. Fred* supported a finding of police domination.[181] Additionally, in this case and *United States v. Fred*, social services had removed the accusers from the suspects' homes before the interrogation occurred.

Sixth, Agent Girod used language that suggested Nahkai's confession was required. Specifically, Agent Girod said "you need to tell me" and instructed Nahkai: "Tell me."[182] Additionally, Agent Girod stated that Nahkai's repeated denials of sexual assault were "not going to help [Nahkai] out at all" and Nahkai needed to tell the truth because:

---

[179] Agent Girod also identified himself as an FBI agent to Nahkai once Nahkai was in the truck. Defendant's Proposed Order, docket no. 72, at 7.

[180] *United States v. Fred*, 322 F. App'x 602, 607 (10th Cir. 2009) (concluding that the display of weapons contributed to the conclusion that the defendant was in custody during the interview); *United States v. Griffin*, 7 F.3d 1512, 1519 (10th Cir. 1993).

[181] *United States v. Fred*, 322 F. App'x 602, 607 (10th Cir. 2009) (stating that the subject of questioning being that of "potentially criminal accusations" of sexual misconduct supported a finding of police domination).

[182] Gov. Ex. 1, at 16:56-18:05, 23:45-24:31.

> There's people out there that think you're a rapist and you did terrible things to her. But I, I don't think that. But I can't help you out if you're not telling me the whole truth, right?[183]

In other words, Agent Girod's language and techniques suggested that Nahkai would face greater legal consequences if he did not confess to the accusations against him. The statement also reveals a position of relative power and knowledge that was not fully shared with Nahkai.

Seventh, at the end of the interview Nahkai was told he was free to leave the truck. This language demonstrates that the agents were in full control over the duration of the interrogation, and it was over when the agents decided it was over. Additionally, as previously stated the agents were also in control of the time and place of the interrogation. Based on these factors, the agents dominated the encounter with Nahkai, and this factor weighs in favor of finding that Nahkai was in custody.

### iv. The release of Nahkai after the interview weighs in favor of finding Nahkai was not in custody

The release of a suspect after questioning is relevant to custodial analysis according to *United States v. Wagner*, though several other Tenth Circuit opinions that were issued before and after *United States v. Wagner* have relied only on the other three factors. Other cases do not consider the release of the suspect after the interrogation as a factor for determining if the suspect was in-custody.[184]

---

[183] Gov. Ex. 1, at 25:57-26:28.

[184] *United States v. Wagner*, 951 F.3d 1232, 1252 (10th Cir. 2020) (citing *Howes v. Fields*, 565 U.S. 499, 509 (2012)). As stated above, most Tenth Circuit cases that address the in-custody requirement state there are only three non-exhaustive factors, and these cases do not include "the release of the suspect at the end of questioning" as a factor to make an in-custody determination. *See United States v. Lemon*, 714 F. App'x 851, 857 (10th Cir. 2017); *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008); *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993); *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021); *United States v. Zar*, 790 F.3d 1036, 1046 (10th Cir. 2015).

These officers completed their questioning, and released Nahkai without arrest, saying, "you're good to go inside." Even though the statement shows the officers were in control of Nahkai's presence and that he was not free to leave earlier, the fact of release (according to *Wagner*) weighs in favor of finding Nahkai was not in custody during the questioning. However, this factor does not outweigh the three other factors that suggest Nahkai was in custody during his encounter with law enforcement.

### v.   Under the totality of circumstances, Nahkai was in custody during the interrogation

Under the totality of circumstances, Nahkai was in custody during the encounter with law enforcement. First, law enforcement did not inform Nahkai he was free to decline to answer questions; free to leave at any time; or that he was not under arrest, and this omission is "a significant indication of a custodial detention."[185] Second, Agent Girod accused Nahkai of committing sexual assault on several occasions and of withholding the truth several times during the encounter. Additionally, Agent Girod implicitly threatened Nahkai on one occasion, and Agent Girod directed Nahkai to confess on several occasions.[186] While the questioning of Nahkai was not prolonged, it was highly accusatory and coercive. Third, law enforcement dominated the encounter because: (1) the agents were in control of the questioning environment by showing up to Nahkai's house unannounced and directing Nahkai to enter the police vehicle for questioning; (2) Investigator Nez had a gun and badge visible during the encounter; (3) the agents denied Nahkai's wife the opportunity to be present for the questioning of Nahkai; (4) Nahkai was aware the questioning would relate to accusations of sexual misconduct; (5) Agent Girod used language

---

[185] *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021); *see also United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) ("[T]he lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention.").

[186] Gov. Ex. 1, at 25:57-26:28 ("There's people out there that think you're a rapist and you did terrible things to her. But I, I don't think that. But I can't help you out if you're not telling me the whole truth, right?").

that suggested Nahkai's confession was required; and (6) Agent Girod threatened or implicitly threatened Nahkai during the encounter. Based on these facts, the first three factors, and the totality of circumstances, a reasonable person in Nahaki's position would not feel free to leave.

There are some facts that support the government's position that Nahkai was not in custody during the encounter. Specifically: (1) Nahkai was not handcuffed, searched, or touched in any way; (2) the agents traveled in unmarked vehicles; (3) the questioning occurred on Nahkai's property; (4) Nahkai was only questioned by two officers; (5) the questioning only lasted 41 minutes; (6) Nahkai was in the front passenger seat while questioning occurred; and (7) Nahkai complied with the agents request to enter the agents' truck. However, under the totality of circumstances, a reasonable person would have felt they were *not* free to leave this encounter with law enforcement. Nahkai was in custody during the encounter because "a reasonable person in the suspect's position would reasonably believe her freedom of action had been curtailed to a degree associated with a formal arrest[.]"[187] Therefore, the interrogation of Nahkai is suppressed and inadmissible.

### vi.    This Order does not consider the fact the interview was conducted in English or that Nahkai is a member of the Navajo Nation

Nahkai argued in his proposed order and at the third hearing that the fact that the agents conducted the questioning in English should be considered as a fact under the totality of circumstances for finding that he was in custody when questioning occurred.[188] Specifically, Nahkai argued:

> But English is clearly not Mr. Nahkai's easier language. The fact that Agent Girod chose to question Mr. Nahkai in English, when there was a Navajo officer present who could have conducted the interrogation in Navajo, is a choice that informs this court's analysis. It adds a coercive layer to the questioning that

---

[187] *United States v. Lemon*, 714 F. App'x 851, 857 (10th Cir. 2017).

[188] Nahkai Proposed Order, at 17; Tr. of Third Hearing, at 35:6-37:10.

contributes to a reasonable belief that Mr. Nahkai was not free to end the interview.[189]

Additionally, at the third hearing, Nahkai argued:

> [Investigator Nez] then, in fact, did speak to Mr. Nahkai in Navajo, showing he could communicate in Navajo, Mr. Nahkai easier language. He could have continued, but it appeared the police then chose not to. Instead, then once the interrogation began, both officers including, [Investigator Nez] spoke English. This is a code switch. It adds a coercive layer of control, because to a reasonable person, the use of English appeared to be a deliberate police choice, when another option was available, that places Mr. Nahkai at a disadvantage to put him less in control and the police more in control. [190]

In response, the government argued that the fact the interrogation occurred in English does not support a finding that Nahkai was in custody: "To make a finding that speaking in English to an individual who answers in English, is coercive, or domineering, or dominating, would be to make a finding that no appellate Court has ever made."[191] Neither party cited legal authority in their proposed orders or at oral arguments to support their arguments for this issue. And it is not relevant that English was Nahkai's second language for the in-custody determination because the Tenth Circuit's opinions in *United States v. Zar*, *United States v. Erving L.*, and *United States v. Little* instruct that personal traits are to be disregarded.[192]

---

[189] Nahkai Proposed Order, at 17.

[190] Tr. of Third Hearing, at 36:22–37:7.

[191] Tr. of Third Hearing, at 55:2-5.

[192] *United States v. Zar*, 790 F.3d 1036, 1047 (10th Cir. 2015) ("[T]he particular personal traits or subjective state of mind of the defendant are irrelevant to the objective 'reasonable person' test . . . 'other than to the extent that they may have been known to the officer and influenced his conduct.'") (quoting *United States v. Little,* 18 F.3d 1499, 1505 (10th Cir.1994) (en banc)); *United States v. Erving L.*, 147 F.3d 1240, 1247 (10th Cir. 1998) ("[T]he particular personal traits or subjective state of mind of the defendant are irrelevant to the objective 'reasonable person' test . . . 'other than to the extent that they may have been known to the officer and influenced his conduct.'"). (quoting *United States v. Little,* 18 F.3d 1499, 1505 (10th Cir.1994) (en banc)).

## C. ORDER

Based on Nahkai's Motion to Suppress, the parties' Proposed Orders and arguments, and all of the facts in the record,

IT IS HEREBY ORDERED that Nahkai's Motion to Suppress all statements that Nahkai made to law enforcement on February 10, 2022, is GRANTED.

Signed April 28, 2024.

BY THE COURT

David Nuffer
United States District Judge